UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HASELY THOMAS, YEANDEO DADBAHAL, and
BALDWIN THOMAS,

                                    Plaintiffs,

                -v-

RIVER GREENE CONSTRUCTION GROUP LLC, d/b/a
RIVER GREENE CONSTRUCTION GROUP; AKEIDA
CAPITAL MANAGEMENT, LLC d/b/a ACM
CONTRACTING, LLC; BRINGING BEST
MANAGEMENT LLC; and HARVEY ABRAHAMS,
JONATHAN KRANZLER, and CURTIS ANTOINE,
*individually*,

                                    Defendants.

17 Civ. 6954 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/11/18

---

PAUL A. ENGELMAYER, District Judge:

In this action, three individuals who between 2014 and 2016 did painting and/or

carpentry work for River Greene Construction Group LLC ("River Greene") bring wage-and-

hour and related claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201 *et seq*., and

the New York Labor Law ("NYLL"), N.Y. Lab. Law § 663 *et seq.* Plaintiffs named six

defendants, but four have not appeared; plaintiffs are separately pursuing default judgments

against the non-appearing defendants. These defendants are River Greene itself; Jonathan

Kranzler ("Kranzler") and Curtis Antoine ("Antoine") who, as developed below, supervised

construction work; and Bringing Best Management LLC ("Bringing Best").

With discovery complete, the remaining defendants—Akeida Capital Management, LLC

d/b/a ACM Contracting, LLC ("ACM") and Harvey Abrahams ("Abrahams")—now move for

summary judgment. They argue that the evidence does not permit them to be held liable under

1

the FLSA or NYLL, as it shows that they were not plaintiffs' employers but were only investors in River Greene. For the following reasons, the Court agrees and grants the motion.

## I.    Background

### A.  Factual Background[1]

#### 1.  Formation of River Greene

River Greene is a New York LLC that was formed in September 2013. JSF ¶ 1. It is a general contractor that provides construction and other services to building and renovation projects in and around New York City. *See id.*

Akeida Capital Management, LLC ("Akeida Capital") manages an investment fund that invests in sustainable and renewable energy companies and energy infrastructure projects. Def.

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including defendants' Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 61 ("Def. 56.1"); the Declaration of Andrew M. Wong in support of defendants' motion, Dkt. 59 ("Wong Decl."), and attached exhibits; the Declaration of Harvey Abrahams in support of defendants' motion, Dkt. 60 ("Abrahams Decl."), and attached exhibits; the Declaration of Jacob Aronauer in support of plaintiffs' opposition, Dkt. 86 ("Aronauer Decl."), and attached exhibits; and the parties' joint statement of undisputed facts, Dkt. 55-1 ("JSF").

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Here, plaintiffs have filed no 56.1 Counter Statement. The Court therefore deems defendants' 56.1 statements admitted by plaintiffs to the extent they are supported by admissible evidence.

56.1 ¶ 2.  Abrahams and David Kandolha ("Kandolha") are Akeida Capital's co-founders.  *Id.* ¶ 3.

In 2013, Kranzler approached his friend, Abrahams, and asked him to invest in a contracting company Kranzler was forming, which became River Greene.  *Id.*  ¶ 5.  Abrahams decided that the company was an inappropriate investment for Akeida Capital, *id.* ¶ 6, but decided to make a personal investment, *id.* ¶ 7.  Abrahams discussed the idea with Kandolha, who also decided to make a personal investment in Kranzler's business.  *Id.*  Abrahams and Kandolha together formed ACM Contracting, LLC, which was to be the business entity serving as an investment vehicle for the initial capital for Kranzler's business.  *Id.* ¶ 8.

The members of River Greene were Kranzler, ACM, and BI Development LLC.  *Id.* ¶ 9.  The members agreed that ACM and BI Development, LLC would each contribute $50,000 in initial capital and receive a 35% ownership interest.  *Id.* ¶ 10.  Kranzler, who contributed no initial capital, retained a 30% ownership interest in recognition that he would run the company.  *Id.*

Akeida Capital, ACM, and River Greene share a business address.  *See* JSF ¶ 2, Def. 56.1 ¶¶ 4, 12–13.

### 2.  Structure of River Greene

River Greene began operating in fall 2013.  Def. 56.1 ¶ 14.  Kranzler was the managing director of the River Greene Projects.  JSF ¶ 3.  River Greene hired Antoine, who reported to Kranzler.  Def. 56.1 ¶ 17; *see also* JSF ¶ 3.  Antoine was a subcontractor; River Greene therefore issued him an IRS Form 1099.  Def. 56.1 ¶ 21.  Together, Antoine and Kranzler supervised the painting and carpentry work performed by plaintiffs on River Greene projects.  JSF ¶ 3.

3

Antoine hired plaintiff Yeandeo Dadbahal ("Dadbahal") in 2014 to work on River Greene projects. Def. 56.1 ¶ 24. Dadbahal, in turn, recommended plaintiffs Hasely Thomas ("H. Thomas") and Baldwin Thomas ("B. Thomas") to Antoine, who hired them in 2014 to work on River Greene projects. *Id.* All three plaintiffs were paid in cash on a weekly basis. JSF ¶ 5. They kept track of the time that they worked on a software application named Timesheet Mobile. *Id.* ¶ 4.

### B.    Procedural History

On September 13, 2017, plaintiffs filed a Complaint, on their behalf and on behalf of a putative FLSA collective and NYLL class. Dkt. 1 ("Compl."). Bringing claims against the six defendants listed above, the Complaint alleged that each plaintiff had begun work for River Greene in October 2012, worked there as either a painter or carpenter through fall 2016, and had been denied overtime pay despite consistently working overtime hours. *See* Compl. ¶¶ 57–59, 65–67 (H. Thomas); *id.* ¶¶ 72–74, 79–80 (Dadbahal); *id.* ¶¶ 85–88, 93–97 (B. Thomas). The Complaint also alleged that River Greene had failed to provide employees with required wage notices. *Id.* ¶¶ 52–53. On November 6, 2017, defendants Abrahams and ACM answered. Dkt. 10.

On December 12, 2017, the Court held an initial pretrial conference and approved a case management plan setting the close of fact discovery on March 16, 2018. Dkt. 14. On December 19, 2017, the Court granted plaintiffs leave to amend the complaint for the limited purpose of correcting the spelling of defendant Kranzler's name. Dkt. 17. The next day, plaintiffs so amended. Dkt. 18 ("AC"). On January 12, 2018, Abrahams and ACM answered the AC. Dkt. 21. The other four defendants did not.

Discovery proceeded among plaintiffs and the two answering defendants.  On March 9, 2018, the Court, on request, extended the fact discovery deadline until May 16, 2018.  Dkt. 37. On April 25, 2018, the Court held a conference to resolve outstanding discovery disputes. Dkt. 48.  On June 20, 2018, the Court held a pre-motion conference to discuss Abrahams and ACM's anticipated summary judgment motion and set a briefing schedule.  *See* Dkt. 54.  On July 10, 2018, plaintiffs, Abrahams, and ACM filed a joint statement of undisputed facts.  Dkt. 55. On July 23, 2018, Abrahams and ACM filed a motion for summary judgment, Dkt. 56, the Wong Declaration, Dkt. 59, the Abrahams Declaration, Dkt. 60, an accompanying memorandum of law, Dkt. 58 ("Def. Mem."), and a Rule 56.1 statement, Dkt. 61.  On August 6, 2018, the Court, on request, extended the briefing schedule for the summary judgment motion.  Dkt. 70.  On August 22, 2018, plaintiffs submitted the final version of their opposition brief to the motion ("Pl. Mem."), Dkt. 85, and the Aronauer Declaration, Dkt. 86.  On September 3, 2018, defendants Abrahams and ACM submitted their reply ("Def. Reply").  Dkt. 87.

As to the four defendants who did not answer the Complaint or Amended Complaint, on February 6, 2018, the Clerk of Court entered certificates of default against Kranzler and Antoine. Dkts. 27–28.  On March 30, 2018, the Court granted plaintiffs leave to file a motion for default judgment against Kranzler and Antoine.  Dkt. 39.  On July 23, 2018, plaintiffs filed a motion for default judgment as to River Greene, Bringing Best, Kranzler, and Antoine.  Dkt. 62.  On August 1, 2018, the Court denied the motion without prejudice to refile after plaintiffs obtained certificates of default as to River Greene and Bringing Best.  Dkt. 68.  On August 8, 2018, the Clerk of Court entered certificates of default against River Greene and Bringing Best.  Dkts. 78– 79.  No subsequent application for a default judgment against the four non-appearing defendants has yet been made.

## II.   Discussion

### A.  Overview

Abrahams and ACM (henceforth, "defendants") make several arguments in pursuing summary judgment.  At the outset, they argue that although the Complaint summarily alleges that Akeida Capital Management, LLC "do[es] business as" ACM Contracting, the evidence reflects that the two are distinct entities and that Akeida has no connection to River Greene.  On that ground, they argue, Akeida Capital Management should be dismissed as a party, leaving ACM and Abrahams as the sole served defendants.  Defendants next argue that the evidence does not permit the conclusion that either Abrahams or ACM was plaintiffs' employer.  Rather, they argue, the evidence shows that each was merely an investor in River Greene and as such cannot be held liable to plaintiffs on their wage claims.  Finally, defendants argue that plaintiffs failed to provide them with the notice required by New York Limited Liability Company Law § 609(c) necessary to permit the imposition of liability for unpaid wages on LLC members with the largest ownership stakes.

Plaintiffs principally counter that, viewing the evidence in the light most favorable to them, Abrahams exercised sufficient control over plaintiffs' employment to make him an employer of theirs under the FLSA and NYLL, and that ACM's shared office space with River Greene signifies a joint employer relationship.

The Court addresses these arguments in turn, after first reviewing the governing legal standards.

### B.   Applicable Legal Standards

#### 1.   Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

2.      **Standards Governing "Employer" Status**

a.      **FLSA**

The FLSA extends liability to any "employer" that violates its terms. *See* 29 U.S.C.

§ 216(b).  It defines an "employer" as "any person acting directly or indirectly in the interest of

an employer in relation to an employee." *Id.* § 203(d).  "An entity 'employs' an individual under

the FLSA if it 'suffer[s] or permit[s]' that individual to work." *Zheng v. Liberty Apparel Co.*,

355 F.3d 61, 66 (2d Cir. 2003) (quoting 29 U.S.C. § 203(g) (alterations in original)).  This is

"'the broadest definition [of "employ"] that has ever been included in any one act.'" *United*

*States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting 81 Cong. Rec. 7675 (1937)

(statement of Sen. Hugo L. Black) (alteration in original)).  "An entity 'suffers or permits' an

individual to work if, as a matter of 'economic reality,' the entity functions as the individual's

employer." *Zheng*, 355 F.3d at 66.

The Second Circuit treats employment under the FLSA "as a flexible concept to be

determined on a case-by-case basis" by looking to the "'economic reality' of a particular

employment situation." *Barfield v. N.Y.C. Health and Hospitals Corp.*, 537 F.3d 132, 141–42

(2d Cir. 2008).  In its most recent exposition of the economic reality test, the Second Circuit

described "three tests—or, more accurately, three sets of factors—[that] guide our determination

of whether a joint employment relationship exists." *Greenawalt v. AT & T Mobility LLC*, 642

Fed. App'x 36, 37 (2d Cir. 2016).[2]

The first test, set out in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir.

1984), "looks to whether a putative employer exercises 'formal control' over a worker,"

---

[2] Although *Greenawalt* was decided by summary order, which lacks precedential effect, the
Court finds instructive the Second Circuit's application there of its precedents regarding the tests
applicable to "employer" status.

*Greenawalt*, 642 Fed. App'x at 37 (citing *Zheng*, 355 F.3d at 72).  The *Carter* test defines

employment more narrowly than required by the FLSA and so satisfying the test is sufficient, but

not necessary, to show joint employment.  *Id.  Carter*'s four-factor test examines "whether the

alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled

employee work schedules or conditions of employment, (3) determined the rate and method of

payment, and (4) maintained employment records."  *Carter*, 735 F.2d at 12.

The second test, drawn from *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988),

is most relevant to distinguishing between independent contractors and employees.  It focuses on

whether "the workers depend upon someone else's business . . . or are in business for

themselves," *id.* at 1059.

*Greenawalt* clarified a third, middle test, first articulated in *Zheng* and relevant here.  It

inquires whether an entity exercised "functional control" over subcontracted workers so as to

constitute their employer under the FLSA.  642 Fed. App'x at 37–38 (citing *Zheng*, 355 F.3d at

61).  *Greenawalt* summarized the six relevant *Zheng* factors as follows:

1. Whether [the putative employer's] premises and equipment were used for [the putative employees'] work . . . .
2. Whether [the contractor] . . . had a business that could or did shift as a unit from one employer to another . . . .
3. The extent to which [the putative employees] performed a discrete line-job that was integral to [the putative employer's] business . . . .
4. Whether responsibility under the contracts could pass from one subcontractor to another without material changes . . . .
5. The degree to which [the putative employer] or its agents supervised [the putative employees'] work . . . .
6. Whether [the putative employees] worked exclusively or predominantly for [the putative employer.]

642 Fed. App'x at 38–40.  These factors are "nonexclusive and overlapping," *Zheng*, 355 F.3d at

75, and a court "'need not decide that every factor weighs against joint employment' in order to

grant summary judgment for the putative joint employer," *Greenawalt*, 642 Fed. App'x at 38.

### b.   NYLL

The NYLL defines "employer" as "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." N.Y. Lab. L. §§ 190(3), 651(6).  The New York Court of Appeals has not answered the question whether the tests for "employer" status are the same under the FLSA and NYLL.  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013).  However, district courts in this Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA."  *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (quoting *Jiao v. Shi Ya Chen*, No. 03 Civ. 165 (DF), 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007)); *see also Hart v. Rick's Cabaret Intl., Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013) ("The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA"); *Sethi v. Narod*, 974 F. Supp. 2d 162, 188–89 (E.D.N.Y. 2013) (collecting cases).  Neither party has argued that the NYLL calls for a different definition from the FLSA here.  For purposes of this decision, the Court accordingly treats the FLSA and NYLL definitions of "employer" as co-extensive.

### C.   Analysis

#### 1.  Status of Akeida Capital Management, LLC

The AC names "Akeida Capital Management, LLC d/b/a ACM Contracting, LLC" as a defendant.  AC at 1.  Defendants argue that the evidence adduced demonstrates that Akeida Capital Management, LLC ("Akeida") and ACM Contracting, LLC are in fact distinct entities, and that the former has no connection to River Greene.  Def. Mem. at 6; *see also* Def. Reply at 7–9.  They ask the Court to dismiss Akeida as a party to this action.  Subject to their other bases

for pursuing dismissal, they do not object to the Court's treating ACM Contracting LLC as the correctly-sued party. *Id.*

In support of dismissing Akeida, defendants offer Abrahams' declaration recounting the formation of ACM Contracting LLC. *See* Abrahams Decl. ¶¶ 2–4. Abrahams attests that ACM Contracting LLC was formed not by Akeida but with his personal funds and those of his business partner, Kandolha, who did so with the express purpose of funding River Greene. *Id.* Defendants attach ACM Contracting LLC's Articles of Formation from September 2013, which are consistent with Abrahams' declaration and do not indicate that Akeida played any role in forming ACM Contracting LLC. Abrahams Decl. Ex. A. Defendants also submit River Greene's Operating Agreement, Abrahams Decl. Ex. B. In it, "Akeida" is defined as "ACM Contracting LLC," *id.* at 2, and its address is specified as "c/o Akeida Capital Management," reinforcing that the two are distinct entities, *id.* at 21.

Plaintiffs have not come forward with any evidence to the contrary. Plaintiffs instead appear to anchor their theory that Akeida is accountable for ACM Contracting's actions based on the fact that the two entities share common partners and initials, "ACM." But these facts are not sufficient, or close, to establish that the two are one entity, with Akeida "doing business as" ACM Contracting. All evidence, including the governing corporate documents and the source of ACM Contracting's funding, is to the contrary.

Accordingly, the Court dismisses plaintiffs' claims against Akeida, and treats the entity whom plaintiffs seek to sue here under that name as ACM Contracting, LLC.

### 2. Are Abrahams and ACM Contracting Plaintiffs' "Employers"?

The entity that as pled was plaintiffs' direct employer, River Greene, is not before the Court on this motion, as a result of its failure to appear. Plaintiffs appear, at least on the

pleadings, to have substantial arguments that some other non-appearing defendants are their joint employers. However, the relationship asserted here between plaintiffs and the two defendants who have appeared is quite attenuated. Based on the admissible evidence, including the parties' stipulation, Abrahams is one of two partners in ACM Contracting LLC, a corporation that has a 35% ownership interest in River Greene, which in turn employed Kranzler, who in turn hired Antoine as a subcontractor, who in turn hired the plaintiffs bringing suit in this case. And discovery has adduced few facts even potentially indicative of an employment relationship between those defendants and plaintiffs. For the reasons that follow, the Court finds that ACM and Abrahams were not plaintiffs' employers. The evidence would not permit a trier of fact to find that they exercised control either over River Greene's employment decisions and practices or over those of its subcontractor, Antoine, as would be required for employer liability here.

### a. Abrahams

Abrahams argues that he was not plaintiffs' employer under either the *Carter* or *Zheng* tests. Def. Mem. at 7–11.

### i. The *Carter* Test

The *Carter* test, reviewed above, examines whether a defendant was a joint employer under the FLSA. It considers four factors.

The first is the purported employer's power to hire and fire the purported employees. This factor disfavors plaintiffs because, as Abrahams notes, no evidence whatsoever has been adduced that he controlled whether plaintiffs were hired or fired.

Plaintiffs do not seriously dispute this. Instead, they contend that Abrahams had hiring authority over Antoine, plaintiffs' supervisor, and that this in turn is sufficient to give rise to an inference that Abrahams had hiring authority over plaintiffs. Pl. Mem. at 3–4, 10–11. Plaintiffs

base the inference that Abrahams had authority to hire Antoine on an email exchange between Kranzler and Abrahams, and on the claim that Abrahams confirmed having this authority at his deposition. *Id.* at 4. But the materials on which plaintiffs rely do not substantiate this claim. Kranzler's initial email to Abrahams reveals *Kranzler's* plan to hire Antoine. He asks Abrahams for $2,500 that can be loaned to Antoine to enable Antoine to pay the costs of moving to New York from Massachusetts. *See* Aronauer Decl. Ex. C at 26 (D175). Abrahams responds: "what did BI say about this? how are we paying him?" *Id.* at 25 (D174). On the face of the email, it does not reveal that Abrahams made the decision to hire Antoine, so much as that he inquired about it afterwards and assisted—as an investor might—in providing stopgap funding to enable the new hire, subcontractor Antoine, to travel to the new job. And the email exchange is affirmatively inconsistent with the claim that Abrahams set Antoine's pay rate: to the contrary, Abrahams asks Kranzler about Antoine's pay. Nor did Abrahams' deposition support plaintiffs' inference; Abrahams testified that he did not recall the email exchange or any associated discussion. *See* Aronauer Decl. Ex. F at 61–63 (Abrahams deposition). Without more, the quotidian email exchange on which plaintiffs rely supports only that Kranzler was seeking additional funds (a loan) from an investor to cover an employee's moving expenses, not that the investor was responsible for the employment or salary decisions. *See id.* ("Q: He's asking for permission?  A: He's asking for money, not for permission.").

In any event, even if this exchange could credibly be read to reflect that Abrahams had influence over whether Kranzler hired subcontractor Antoine and what Antoine was paid, the email would not support the inference necessary under this *Carter* test factor. Indeed it does not establish, even inferentially, that Abrahams had any role in the hiring and firing of the three

*plaintiffs,* or even that he knew in advance about plaintiffs' hiring or the terms of their employment.

Plaintiffs rely on *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 193 (S.D.N.Y. 2003), which supports, plaintiffs assert, that this factor requires not that Abrahams "directly hire[d] workers" or had "direct control" over them, but only that he hired "managerial staff." *See* Pl. Mem. at 11. The *Carter* test, by its terms, is to the contrary. Moreover, *Ansoumana* is inapposite, as the discussion in it on which plaintiffs rely summarized the facts of *Herman v. RSR Sec. Svcs. Ltd.*, 172 F.3d 132 (2d Cir. 1999), which are easily distinguished from those here. In *Herman*, the Second Circuit held that a part owner of a security guard company had exercised sufficient control over the security guards to make him their employer. *Id.* at 140. But the part owner had directly hired four staff members, some of whom supervised the guards, *id.*, and had referred several individuals as potential security guard employees, *id.* at 137. These facts far more credibly permitted the inference of a part-owner's overall supervisory control of employees than does the evidence here. Abrahams' tenuous (at best) connection to the hiring of a single subcontractor manager does not, without more, support the inference that he played any role in that subcontractor's hiring or firing practices.

The first *Carter* factor therefore weighs strongly against plaintiffs.

The Court analyzes together the next three *Carter* factors: whether the purported employer supervised or controlled his purported employees' work schedules and conditions of employment; whether he determined the purported employees' rate and method of payment; and whether the purported employer maintained employment records. Plaintiffs have not adduced any direct evidence that Abrahams had any such responsibilities or ever took any action along these lines. And Abrahams attests to the contrary. He attests that he visited the River Greene

14

Project sites on only six or so occasions over a two-year period; that he did so only to check on the status of his investment; and that he had no involvement in the rate or method of plaintiffs' pay, in setting their work schedules, or in maintaining records as to their employment. Abrahams Decl. ¶ 8, 10.  Consistent with his testimony, defendants note, plaintiffs have attested they saw Abrahams on site only a handful of times and admit that they did not have any contact with him. *See, e.g.*, Wong Decl. Ex. C at 24 (H. Thomas deposition).

Plaintiffs' argument as to these factors begins with their claim that Abrahams participated in hiring Antoine.  From this, plaintiffs infer that Abrahams had broader operational control over River Greene, including vicarious responsibility for the employment terms of subcontractor Antoine's direct reports.   For the reasons addressed above, however, plaintiffs' premise that Abrahams hired Antoine is unsupported by record evidence.  And the further inference that he therefore controlled the terms of others' employment is wholly speculative.

Aside from Abrahams' alleged participation in hiring Antoine, plaintiffs point only to stray evidence.  As to the second *Carter* factor of work schedules and conditions, plaintiffs point only to B. Thomas's hearsay assertion that, outside of his presence, Abrahams once yelled at Antoine at a work site for sitting around too much.  *See id.* at 4 (citing Aronauer Decl. Ex. G at ¶ 11 ("B. Thomas Decl.")).  Even if this secondhand account were admissible, this anecdote would not establish Abrahams' control over plaintiffs' work schedules or conditions at River Greene. As to the third factor of rate and method of payment, plaintiffs' rely on Abrahams' advance of $2,500 to enable Antoine to move to New York City.  *See* Def. Mem. at 14.  But, for the reasons above, this act does not signify Abrahams' control over plaintiffs' pay.  Separately, plaintiff B. Thomas attests that he understood that his pay derived indirectly from checks with which Abrahams (and perhaps other investors) weekly infused River Greene.  B. Thomas Decl. ¶ 7.

But even assuming that there were admissible evidence that Abrahams was a source of the funds that the subcontractor ultimately used to pay plaintiffs, that practice—unremarkable for an investor in a new business—does not suggest the investor's control over the terms and methods of the pay of the subcontractor's employees.  Construing Abrahams' payments in the light most favorable to plaintiffs, plaintiffs still describe no facts that Abrahams set plaintiffs' rate or method of payment.  Finally, as to the fourth *Carter* factor, maintenance of employment records, plaintiffs do not appear to argue that it is met.  Pl. Mem. at 14.

The threadbare record developed in discovery therefore does not satisfy, as to Abrahams, any of the *Carter* factors.   Where these factors are not met, the Court nevertheless is "obligated to consider any and all additional circumstances that evidenced [the defendant's] control over Plaintiffs." *Velasquez v. U.S. 1 Farm Market, Inc.*, No. 3:13 Civ. 634 (GWC), 2016 WL 2588160, at *9 (D. Conn. May 3, 2016)).  The Court therefore next considers the *Zheng* factors.

### ii.  The *Zheng* Factors

As discussed in *Greenawalt*, the *Zheng* factors are productively used to guide consideration of whether, in the context of a subcontractor relationship, the general contractor was a joint employer.  It is undisputed that Antoine was hired by River Greene as a subcontractor.  Def. 56.1 ¶ 21 (citing Abrahams Decl. Ex. C (copies of Antoine's 2013–16 1099-MISC forms from River Greene)); *see also* Aronauer Decl. Ex. C at 17 (D166) (email exchange where Abrahams asks Kranzler "Is curtiss [sic] and [sic] sub or an employee of rivergreene?" and Kranzler replies "Curtis was a sub. He was given a 1099.").

In this lawsuit, the *Zheng* factors would thus naturally guide consideration whether River Greene—had it not defaulted—was a joint employer (with Antoine) of plaintiffs, insofar as River Greene might be found to have exercised "functional control" over the workers whom Antoine

hired.  *See Greenawalt*, 642 Fed. App'x at 37–38 (citing *Zheng*, 355 F.3d at 61).  In the interest of completeness, the Court nevertheless considers the *Zheng* factors as they apply here, with the important caveat that a *Zheng* factor found established as to River Greene does not necessarily signify that the factor would be established as to its investor Abrahams.

*Whether Abrahams' premises and equipment were used for plaintiffs' work*.  River Greene did share a business address with Akeida Management and ACM Contracting, both of which were entities in which Abrahams had a stake.  However, plaintiffs have not adduced any evidence that Antoine, or any of plaintiffs, worked from these entities' premises.  Accordingly, this factor weighs against plaintiffs.

*Whether Antoine had a business that could or did shift as a unit from one employer to another*.  Neither party has pointed to evidence that Antoine worked for any other contractor at the time he worked for River Greene.  And a fair inference from the fact that Antoine moved to New York from Massachusetts specifically to work on River Greene's projects is that these projects were the sole focus of his attention.  *See* JSF ¶ 3.  This factor accordingly weighs in plaintiffs' favor as to River Greene.  However, because the evidence canvassed above in connection with the *Carter* test does not support that Abrahams was more than an investor in River Greene or directed its employment activities, this factor does not support finding *Abrahams'* functional control over Antoine's employees.

*The extent to which plaintiffs performed a discrete line-job that was integral to Abrahams' business*.  Plaintiffs' work on River Greene's projects was surely important to River Greene.  But plaintiffs have not adduced evidence that River Greene's projects were integral to Abrahams, let alone that plaintiffs' carpentry and painting work for River Greene was integral to Abrahams' business.  On the contrary, the evidence is that Abrahams had a separate area of

17

gainful business before deciding to co-invest in River Greene. His primary investment vehicle was Akeida Management, an unrelated entity. And while ACM Contracting LLC's only investment appears to be River Greene, Abrahams was only a 50% partner in ACM Contracting LLC—Kandolha was an equal investor—and ACM Contracting LLC itself had only a 35% stake in River Greene. While neither party has developed a granular portrait of Abrahams' business interests, these facts do not permit, other than speculatively, the conclusion that the River Greene Projects in general, or plaintiffs' work on them in particular, was "integral" to Abrahams' business. This factor, accordingly, weighs against plaintiffs.

*Whether responsibility under the contracts could pass from one subcontractor to another without material changes.* Both parties describe Antoine as the only subcontractor ever considered for the River Greene Projects. Although the record is not certain on this point, it thus appears unlikely that his contract with River Greene could pass to another subcontractor without material changes. Accordingly, this factor weighs in favor of plaintiffs as to River Greene, but again, given the absence of evidence of investor Abrahams' functional control over River Greene, it does not favor plaintiffs as to Abrahams.

*The degree to which Abrahams or his agents supervised plaintiffs' work.* This factor to a large degree overlaps with *Carter*'s first two factors. But, because it invites a more holistic inquiry, the Court takes a broader look at the supervision asserted by plaintiffs. Plaintiffs claim that

> Abrahams requested and received emails pertaining to River Greene's debt, expenses, outstanding invoices, payroll, workers compensation, and insurance. Abrahams had a role in dictating which projects River Greene worked on, as well as advising Kranzler on the expansion of River Greene's business. Additionally, Abrahams signed and notarized requisition and lien waivers on behalf of River Greene; met with River Green's creditors; received bid sheets from Kranzler and delivered them to the proper sources; and was involved in email and in-person discussions concerning River Greene's operating costs, including the cost of labor.

18

> Abrahams was responsible (along with other partners) for providing Kranzler $10,000 each month for salaries for River Greene's staff. Finally, when River Greene had a workers compensation claim against them, Abrahams was e-mailed and interacted with Kranzler about obtaining insurance.

Pl. Mem. at 3–4 (citations omitted). It is not by any means clear that each of these propositions is supported by admissible evidence. But even if these facts as to Abrahams' engagement with and financial involvement in River Greene's business were so supported, none satisfy the *Zheng* factor here: that he or his agents supervised plaintiffs' work. These actions are consistent with an active investor closely monitoring the work to which his money is being deployed; they do not reflect supervision over workers. Accordingly, this factor, too, weighs against plaintiffs.

    ***Whether plaintiffs worked exclusively or predominantly for Abrahams***. Even if plaintiffs worked solely for River Greene, plaintiffs point to no evidence that they worked exclusively for Abrahams. Abrahams was one investor among several in River Greene. The evidence does not permit a claim that the workers worked exclusively or predominantly for him. Accordingly, this factor weighs against plaintiffs.

    Because none of the *Carter* factors, and (as to Abrahams) none of the *Zheng* factors, weigh in favor of plaintiffs, the Court finds that the material facts dictate the legal conclusion that Abrahams was not plaintiffs' employer for purposes of the FLSA or NYLL. The Court accordingly grants Abrahams' motion for summary judgment.

### b.  *ACM Contracting LLC*

    The Court's finding that Abrahams was not plaintiffs' employer disposes of plaintiffs' parallel claim as to ACM, insofar as plaintiffs' argument as to ACM is coterminous with its

argument as to Abrahams.[3]

### 3.   Liability Under N.Y. Limited Liability Company Law § 609

Defendants make a final argument, disputing that ACM and Abrahams can be liable under New York Limited Liability Company Law § 609.  Def. Mem. at 11–12.  That statute "provides that the limited liability company members with the ten largest ownership stakes can be held personally liable, jointly and severally, for 'all debts, wages or salaries due and owing to any of its laborers, servants or employees, for services performed by them for such limited liability company.'"  *Id.* at 11 (citing N.Y. Ltd. Liab. Co. Law § 609(c)).  ACM and Abrahams argue that this provision is subject to a notice requirement, requiring notice to any such members within 180 days of the termination of services rendered, which plaintiffs have to date failed to satisfy.  *See id.*

The Court has no occasion to reach this argument.  Plaintiffs have not pled liability under § 609(c) in their AC or pursued any such theory in opposing defendants' motion for summary judgment.  Accordingly, the Court has no cause to resolve this abstract question.

### CONCLUSION

For the reasons above, the Court holds that, viewing the evidence in the light most favorable to plaintiffs, there are no genuine disputes of material fact whether Abrahams or ACM was plaintiffs' employer under the FLSA and NYLL.  They were not.  The Court accordingly grants these defendants' motions for summary judgment.

---

[3] It appears to the Court that ACM could likely muster additional arguments—apart from those available to Abrahams—as to why it was not plaintiffs' employer.  In light of the Court's ruling as to Abrahams, however, the Court has no occasion to consider this point.

The Clerk of Court is respectfully directed to grant the motion pending at Dkt. 56 and to terminate Akeida Capital Management, LLC d/b/a ACM Contracting, LLC and Harvey Abrahams as defendants.

Plaintiffs remain at liberty to pursue default judgments against the remaining defendants. If plaintiffs intend to pursue such relief, they are to file motions for default judgment, consistent with this Court's individual rules, within two weeks.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 11, 2018
       New York, New York

21